**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Christopher Draper,** ) | **CASE NO. 18 CV 1321** |
| ) | |
| **Plaintiff,** ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| **Vs.** ) | |
| ) | |
| **Aetna Life Insurance Company,** *et al.*, ) | **Memorandum of Opinion and Order** |
| ) | |
| **Defendants.** ) | |

## INTRODUCTION

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 12) and Plaintiff's Motion for Administrative Remand (Doc. 13). This is an ERISA case. For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED. Plaintiff's Motion for Administrative remand is DENIED.

## FACTS

Plaintiff Christopher Draper brings this lawsuit against Defendants Aetna Life Insurance Company ("Aetna") and Federal Express Corporation Short Term Disability Plan ("the Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et

1

seq. Plaintiff seeks both to overturn Aetna's decision to deny Plaintiff's short term disability benefits, and for damages.

Plaintiff began working for Federal Express Corporation ("Fed Ex") as a truck driver/courier over twenty years ago. (AR 122-23). His job requirements included having the ability to "maneuver packages of any weight above 75 lbs with appropriate equipment and/or assistance from another person." *Id.* at 124. Through his employment, Plaintiff was a Covered Employee under the Plan. Plaintiff's claim for short term benefits under the Plan in this case stems from his alleged back pain.

**<u>The Plan</u>**

Fed Ex established the Plan to fund and pay short term disability benefits to eligible employees. (AR 307). Under the Plan, Fed Ex serves as the plan administrator and Aetna serves as the claims paying administrator. *Id.* at 306, 580. The Plan gives the claims paying administrator discretion to interpret the Plan's terms and determine benefits eligibility. (AR 897). A Plan participant is entitled to receive short term disability benefits if he establishes a "disability" in accordance with the provisions of the Plan. Under Section 1.1 of the Plan, "disability" or "disabled" is defined as follows:

> Occupational Disability; provided, however, that a Covered Employee shall not be deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner **and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms.** In the absence of significant objective findings, conflicts with managers, shifts and/or work place setting will not be factors supporting disability under the plan. *Id.* at 946 (emphasis added).

2

The Plan defines "Occupational Disability" as the "inability of a Covered Employee, because of a medically-determinable physical impairment or Mental Impairment, to perform the duties of his regular occupation." *Id.* at 876. The Fed Ex Employee Benefits Handbook also states: "You are considered disabled if a physical or mental illness or injury prevents you from doing your job. You or your health care professional must provide proof that you are disabled, based on significant objective findings such as . . . medical examination findings, test results, x-ray results, observation of anatomical, physiological or psychological abnormalities. . . ***It is important to remember pain alone is not proof of disability."*** (AR 585) (emphasis in original). The Plan does not say what makes a finding "significant," but it gives the Plan administrator discretion to interpret the Plan's terms. (AR 897).

**Plaintiff's Medical Treatment**

In June 2016, Plaintiff sought treatment for chronic back pain. (AR 15). The medical records show that he had received an MRI in April 2016, which reflected "[m]ild decreased disc height and desiccation with vacuum phenomenon. Central-right paracentral protrusion/extrusion indents the thecal sac and buts the descending S1 nerve roots bilaterally right greater than left with posterior displacement of the descending right S1 nerve root. No central canal or foraminal stenosis." *Id.* An x-ray taken the same month reflected similar findings (in part, "mild disc desiccation" and "mild decreased disc height"). Plaintiff received a lumbar epidural steroid injection at L5-S1 on July 5, 2016. *Id.* at 22, 25. Plaintiff also underwent a cervical MRI in September 2016, which showed "minimal disc bulging at C5-6" which resulted in "minimal thecal sac effacement without central canal stenosis." *Id.* at 79.

In early April 2017, Plaintiff aggravated an injury to his lower back, allegedly causing his

3

persistent back pain to worsen. *Id.* at AR 88. It was at this time that Plaintiff applied for short term disability benefits. On April 6, 2017, Plaintiff met with Dr. Michael Stormont, his family care physician, and reported aching and throbbing pain. *Id.* Dr. Stormont noted that Plaintiff's symptoms were relieved by pain medication and rest, and that they were aggravated by taking the stairs, extension, flexing, twisting, and walking. *Id.*

Dr. Stormont diagnosed Plaintiff with "lumbago" and "radiculopathy of lumbar region," and prescribed Percoset for the pain. *Id.* at 90. On April 12, 2017, Dr. Stormont recommended that Plaintiff be excused from work for two months, and that his activity level was restricted to "light duty and no lifting over 20 lbs." *Id.* at 92. However, six days later, Dr. Stormont completed a seemingly contradictory Attending Physician Statement in which he indicated that Plaintiff had "no limitations of functional capacity" and was able to perform "heavy work activity." *Id.* at 95. Dr. Stormont also indicated that Plaintiff had neither improved nor regressed, but had "stabilized." *Id.*

Plaintiff next met with Dr. Kelly Kiehm, a neurologist. Dr. Kiehm's office note from April 20, 2017, states that Plaintiff's back pain worsened when he transitioned from sitting to standing, and that the injection he received did not alleviate the pain. *Id.* at 96. She also noted, however, that he was "healthy and in no apparent distress" and that his gait/station were normal. *Id.* She stated that his MRI showed "mild degenerative changes and a small herniated disc that would not explain all of his pain." *Id.* She also noted a "broad-based disc at C5-6 causing some effacement of the cord," but that she was "not sure" whether that would cause his pain either. She noted that his Vitamin D levels were very low, and that supplementing with Vitamin D might help alleviate his symptoms. *Id.*

4

On May 10, 2017, Plaintiff was treated by Dr. Sarah Blake, another neurologist. *Id.* at 98. In her exam, Dr. Blake found that Plaintiff's spine was "normal" with "straight alignment with normal range of motion." *Id.* at 99. Nevertheless, she also noted that Plaintiff's range of motion in his lumbar spine was "restricted." *Id.* at 100. She found that he had "[f]ull range of motion with all extremities against gravity and resistance." *Id.* Dr. Blake diagnosed Plaintiff with "other cervical disc displacement," and "other intervertebral disc displacement," as well as spondylosis in the lumbar and lumbosacral regions. *Id.* She noted that Plaintiff was "unable to perform his job duties and quite frankly, if he is taking medications which sedate him and impair his driving to control his pain, then I think it is best if he stays off work until we are able to taper him off of [his pain] medications." *Id.* Dr. Blake altered Plaintiff's pain medications after her exam. *Id.*

In subsequent follow-up visits with Dr. Blake, Plaintiff continued to report pain, and the results of his muscoloskeletal exam were "abnormal." *Id.* at 30, 34, 102. His gait, extremities, and muscle strength, however, all tested "normal." *Id.* Plaintiff had two lumbar facet injections in June 2017. *Id.* at 26, 28. In July 2017, Plaintiff had an MRI of his lumbar spine. *Id.* at 32. This MRI revealed L4/5 and L5/S1 disc bulges with an annular tear at L5/S1. *Id.* at 33. The MRI also revealed "Multifactorial centrol stenosis at L3/L4 through L5/S1, inclusive," as well as a "right paracentral annular fissure and disc protrusion mildly compress[ing] the right S1 nerve root," and "[b]ulging disc and central disc protrusion at L4/L5 contacting both L5 nerve roots." *Id.* Dr. Blake's treatment notes following the MRI again reflected an abnormal musculoskeletal exam, and found that his gait and station were normal. She did not opine on whether the MRI results accounted for Plaintiff's pain, or whether Plaintiff could perform the essential duties of

5

his job.  Her diagnosis of Plaintiff remained unchanged.  *Id.* at 34-35.

**Peer Reviews**

Aetna submitted Plaintiff's medical documentation to Dr. Ryan Trombly, a neurologist, for an initial physician peer review in June 2017.  *Id.* at AR 104.  Dr. Trombly reviewed Plaintiff's medical records, including Dr. Blake's notes and Plaintiff's 2016 MRI results.  *Id.* at 105-06.  Dr. Trombly's review did not include the results of Plaintiff's 2017 MRI, which had not yet occurred.  Dr. Trombly opined that the records lacked significant physical and neurological abnormalities that would support a functional impairment that would preclude Plaintiff from performing the essential job duties of his occupation.  *Id.* at 107.

In August 2017, Aetna submitted for review all of the updated medical records, including the July 2017 MRI, to Dr. Kene Ugokwe for another physician peer review.  *Id.* at 109.  Dr. Ugokwe indicated in his report that he reviewed all of Plaintiff's medical records, and attempted to contact Dr. Blake twice to discuss Plaintiff's case, but was unable to reach her.  *Id.* at 110-112.  Dr. Ugokwe noted that had he spoken to Dr. Blake, he would have asked her to elaborate on Plaintiff's functional abilities, including her opinion regarding Plaintiff's ability to perform his job.  *Id.*  Based on his review, Dr. Ugokwe concluded that the records lacked significant objective clinical documentation to show a functional impairment that would preclude Plaintiff from performing the essential duties of his occupation.  Specifically, Dr. Ugokwe stated:

> [Plaintiff is] neurologically intact and subjectively complains of pain
> that is being managed with medications and facet injections.  The
> lumbar MRI shows some degenerative changes. [Plaintiff] has full
> strength on motor testing in all extremities and sensation is intact and
> there is no identifiable objective reason to support impairment from
> 4/11/17 to present.

*Id.* at 112.  Dr. Ugokwe did not assess the 2017 MRI in any additional detail.  *Id.*

6

**Aetna's Denials of Plaintiff's Claim**

Plaintiff applied for short term disability benefits as of April 11, 2017. On April 26, 2017, Aetna sent Plaintiff a letter stating that there were no significant objective findings to substantiate a disability as defined by the Plan. Aetna requested that Plaintiff submit additional documentation and suspended the continued processing of Plaintiff's claim. (AR 114-115). On June 21, 2017, after receiving additional documentation including the initial peer physician review by Dr. Trombly, Aetna denied Plaintiff's benefits application. *Id.* at AR 08-10. In its denial letter, Aetna acknowledged receipt of Plaintiff's physician office notes, physician statements, and the 2016 MRI, among other medical records. Aetna stated that it reviewed the file in full and concluded that there were insufficient objective findings of a functional impairment. *Id.* Aetna noted that Dr. Blake had found that Plaintiff had a healthy appearance and that Plaintiff was in no apparent distress. *Id.* Aetna also relied upon Dr. Blake's consistent findings that Plaintiff had normal strength and gait, and that the medical records did not indicate any significant loss of motion of the lumbar spine. *Id.*

Plaintiff appealed the denial, and in November 2017, Aetna's appeal review committee evaluated Plaintiff's claim and upheld the denial of benefits. (AR 01-03). The denial letter, dated November 6, 2017, cites the relevant Plan language defining disability and reiterating the requirement that the claimant provide "significant objective findings" to substantiate his claim for benefits. *Id.* at 01. The letter states that the review committee reviewed the entire administrative record, including the case management notes, medical documentation, the appeal letter, and the peer physician review reports, among other items. *Id.* The letter also outlines the results of the 2016 and 2017 MRIs and the results of the physical testing performed by Plaintiff's

doctors. *Id.* The letter states that after the 2017 MRI, Plaintiff's follow-up appointment with Dr. Blake resulted in a normal physical exam, demonstrating full strength in all extremities with normal sensation. *Id.* The letter states that Plaintiff's diagnostic testing only showed "minimal degenerative changes," and that there were "no reported side effects" from prescribed medications. The letter states that for these reasons, Plaintiff's medical records did not reflect the necessary objective findings to support his claim. *Id.* at 02.

**STANDARD OF REVIEW**

The decision of an ERISA plan administrator to deny benefits is reviewed de novo, unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where there is a clear grant of discretionary authority to the administrator under the terms of the Plan, the Court applies an arbitrary and capricious standard of review to the administrator's decision to deny benefits. *Filthaut v. AT&T Midwest Disability Ben. Plan*, 710 Fed. Appx. 676, 680 (6th Cir. 2017). In this case, there is no dispute between the parties that the Plan grants discretionary authority to Aetna as the claims administrator. Accordingly, the Court reviews Aetna's decision denying benefits under the arbitrary and capricious standard.

The arbitrary and capricious standard is the "least demanding form of judicial review of administrative action . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Evans v. UnumProvident Corp.,* 434 F.3d 866, 876 (6th Cir. 2006). However, the arbitrary and capricious standard of review is not a mere "rubber stamp" of the plan administrator's decision. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Instead, the Court must consider the

evidence and determine if the decision was "the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *Filthaut,* 710 Fed. Appx. at 680.

**ANALYSIS**

Defendants move for summary judgment on the basis that Aetna's denial of Plaintiff's claim for disability benefits was premised on its proper construction of the Plan and a thorough review of Plaintiff's records. Plaintiff argues that Aetna improperly minimized or excluded the 2017 MRI findings and other evidence, resulting in an inadequate explanation for the denial of benefits. Upon review, the Court agrees with Defendants.

In reviewing ERISA claims, courts must evaluate the quality and quantity of the medical evidence and the opinions on both sides. *DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009). In conducting this review, a plan's requirements bind participants and the court. *See Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 166 (6th Cir. 2007). The Sixth Circuit has stated that the Court must consider several factors to evaluate the rationality of the administrator's decision-making process: "the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT&T Umbrella Ben. Plan No. 1,* 795 F.3d 538, 547 (6th Cir. 2015). In *Shaw,* the Sixth Circuit found that the plan administrator acted arbitrarily and capriciously in denying benefits because the administrator "ignored favorable evidence submitted by [the claimant's] treating physicians, selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating physicians." *Id*. Applying

these factors, Aetna's denial of benefits here was not arbitrary and capricious.

**A. Quality and Quantity of the Medical Evidence**

Courts must evaluate the quality and quantity of the medical evidence and the opinions on both sides in reviewing ERISA claims. *DeLisle,* 558 F.3d at 446. In conducting this review, a plan's terms bind its participants. *See Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 166 (6th Cir. 2007). In this case, the Plan states that an "occupational disability" exists when an employee cannot "perform the duties of his regular occupation." (AR 878). To substantiate his claim, Plaintiff was required to produce "significant objective findings" showing "significant anatomical, physiological or psychological abnormalities which [could] be observed apart from the individual's symptoms." *Id.* at 878. The Plan does not say what makes a finding "significant," but gives the Plan administrator discretion to interpret the Plan's terms. *Id.* at 897.

The Sixth Circuit has consistently recognized that "[g]enerally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the administrator's decision." *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003). Plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). A plan administrator is also, however, not required to accord special weight to a claimant's treating physician. *Id.*

Here, the quality and the quantity of the evidence show that Aetna's denial of Plaintiff's short term disability benefits claim was not arbitrary and capricious. To be eligible for short term disability benefits, Plaintiff had to show, with significant objective findings, that his back pain prevented him from performing the duties of his position at Fed Ex. As set forth above, Plaintiff submitted various tests, physician reports, and notes in support of his claim. Plaintiff had his first MRI in 2016. Dr. Kiehm, one of Plaintiff's treating neurologists, concluded that this MRI showed "a small herniated disc" and a "broad-based disc at C5-6" that would not explain all of Plaintiff's pain. (AR 96). During her exam of Plaintiff in April 2017, Dr. Kiehm noted that despite Plaintiff's complaints of back pain, he was "healthy and in no apparent distress," and that his gait and station were normal. *Id.* Although Dr. Stormont, Plaintiff's family care physician, opined in April 2017 that Plaintiff was unable to work due to his alleged pain, he appeared to change his conclusion several days later in his Attending Physician Statement. *Id.* at 92, 95.

Dr. Blake, another board-certified neurologist, found that Plaintiff's spine was "normal" with "straight alignment with normal range of motion" on May 10, 2017. *Id.* at 37. She also found that Plaintiff's lumbar spine was "restricted" but that he had "[f]ull range of motion with all extremities against gravity and resistence." *Id.* She found that his 2016 MRI "was significant for a C5-6 annular bulge," and she diagnosed Plaintiff with disc displacement and spondylosis. *Id.* at 98. Plaintiff had his second MRI in July 2017. This MRI revealed, in part, "L4/5 and L5/S1 disc bulges with an annular tear at L5/S1." *Id.* at 34. Both before and after the 2017 MRI, Dr. Blake charted an "abnormal" musculoskeletal exam. *Id.* at 34, 102. She also consistently found that his gait and station were normal and that his extremities were "benign." *Id.* Notably,

11

her diagnosis of Plaintiff did not change after the 2017 MRI. *Id.* Neither Dr. Kiehm nor Dr. Blake opined on whether Plaintiff could perform his regular duties at his job. On the other hand, both of the independent physician peer reviewers (Drs. Twombly and Ugokwe) concluded that the clinical results and exam findings did not substantiate Plaintiff's claim for benefits. (AR 107, 112). Only Drs. Blake and Ugokwe reviewed the 2017 MRI results.

Aetna's review committee determined that Plaintiff had not supported his claim for disability benefits with significant objective evidence. The final denial letter, dated November 6, 2017, set forth the plan language and Plaintiff's obligation to substantiate his claim with "significant objective findings." (AR 01). The letter outlined the office notes, diagnostic testing, and physician reports in Plaintiff's file. *Id.* The letter specifically acknowledged the notes by Dr. Stormont, Dr. Kiehm, and Dr. Blake. *Id.* The letter also outlined the results of the 2016 and 2017 MRIs, as well as Plaintiff's medication history. *Id.* The letter referenced the peer physician reviews by Dr. Twombly and Dr. Ugokwe. *Id.* The review committee found relevant that the physical exams showed that Plaintiff was neurologically intact and demonstrated full strength in all extremities with normal sensation. *Id.* at 02. The letter also stated that the diagnostic testing showed only "minimal degenerative changes" and concluded that Plaintiff had not supported his claim with significant objective evidence as required by the Plan. *Id.*

Plaintiff argues that under *Corey v. Sedgwick Claims Management Servs., Inc.,* 858 F.3d 1024, 1028 (6th Cir. 2017), Aetna's analysis did not adequately explain why the 2017 MRI did not constitute "significant objective findings" to substantiate his claim. Plaintiff argues that the MRI constitutes a "test or medical exam," which is listed as an example of an "objective finding" in the Plan, and that the denial letter failed to explain why the MRI was not sufficiently

12

significant. In response, Defendants argue that Aetna adequately considered the 2017 MRI results and explained why the evidence did not substantiate Plaintiff's claim.

The Court agrees with Defendants. As set forth above, the final denial letter issued by Aetna's review committee outlined the results of the 2017 MRI, and considered those results in conjunction with the notes and testing performed by Plaintiff's doctors. (AR 01-02). Aetna also referenced the peer physician reviews by Dr. Twombly and Dr. Ugokwe, both of whom concluded that the clinical results and exam findings provided by Plaintiff did not substantiate his alleged impairment. *Id.* The denial letter concluded that the 2017 MRI showed only "minimal degenerative changes," which is partially why Plaintiff's claim was denied. *Id.* Although it is true that the denial letter did not specifically identify the 2017 MRI as an "objective finding," it did explain why the 2017 MRI did not substantiate Plaintiff's claim.

This analysis meets the standard established in *Corey*. In *Corey,* the plan identified medications and treatment plans as examples of "objective findings" that could substantiate a disability. *Id.* at 1025. The plan administrator, however, never explained why the claimant's medications and treatment plan failed to satisfy the definition of an "objective finding," and did not even acknowledge the medications or treatment plan in the denial letter. *Id.* at 1027. The administrator merely quoted the plan language and concluded, with no explanation, that the plaintiff's evidence failed to suffice. *Id.* at 1027-28. The Sixth Circuit stated that this was inadequate, and that a plan administrator cannot merely "issue a conclusory denial and then rely on an attorney to craft a post-hoc explanation." *Id.* at 1028.

Here, in contrast, Aetna's denial letter reviewed the 2017 MRI results and the subsequent evaluations by Dr. Blake and Dr. Ugokwe, and concluded that the testing showed only "minimal

13

degenerative changes." Aetna also found that the testing conducted by Dr. Blake demonstrated full strength in all extremities with normal sensation. Although the letter did not contain a robust analysis pertaining specifically to the 2017 MRI, it reflected consideration of all relevant evidence and gave specific reasons as to why Plaintiff did not adequately substantiate his claim with significant objective findings.

Plaintiff takes issue with Aetna's reliance upon Dr. Ugokwe's report, arguing that his analysis of the 2017 MRI was "glib" and insufficient. Defendants argue that Aetna's reliance on Dr. Ugokwe's analysis was proper, and that Aetna also relied upon Dr. Blake's opinion in reaching its conclusion. The Court agrees with Defendants. A plan administrator may rely upon the opinions of its file reviewers if it provides reasons for adopting those opinions that are consistent with its responsibility to provide a full and fair review of the claim. *See Curry v. Eaton Corp.,* 400 Fed. Appx. 51, 65 (6th Cir. 2010). Here, Dr. Ugokwe's report stated that he reviewed Plaintiff's entire medical file. (AR 112). Dr. Ugokwe specifically stated that the 2017 MRI showed "some degenerative changes," but that Plaintiff had full strength on motor testing in all extremities, and his sensation was intact. *Id.* He concluded that there was no significant objective clinical documentation that would reveal a functional impairment that would preclude Plaintiff from performing the essential duties of his job. *Id.*

While it is true that Dr. Ugokwe did not elaborate on the 2017 MRI beyond stating that it showed "some degenerative changes," his report indicates that he considered the relevant testing and drew a conclusion as to its impact. Importantly, Plaintiff provides no other opinion to dispute Dr. Ugokwe's conclusion, and the Plan places the burden on Plaintiff to establish that his disability prevented him from doing his job. Dr. Ugokwe was the only physician who opined on

14

the issue of whether the 2017 MRI results substantiated Plaintiff's complaints of pain. Defendants properly considered this evidence in reaching their conclusion.

Moreover, there is no indication that Aetna selectively reviewed Dr. Ugokwe's report to the exclusion of Plaintiff's other treating physicians. (AR 02). Specifically, there is no evidence to suggest that Aetna arbitrarily favored Dr. Ugokwe's opinion over Dr. Blake's. The Sixth Circuit has held that *"*[g]iving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious." *Curry,* 400 Fed. Appx. at 59. In this case, however, Dr. Ugokwe's conclusions were not inconsistent with Dr. Blake's conclusions. As stated above, Dr. Blake did not opine on whether Plaintiff was suffering from a functional impairment when she saw him after the 2017 MRI. *Id.* at AR 34. She also did not analyze the 2017 MRI in any detail, or correlate the MRI findings to Plaintiff's alleged pain. *Id.* Moreover, Plaintiff's argument that Aetna improperly ignored Dr. Blake's diagnosis is not supported by the record. Dr. Blake originally diagnosed Plaintiff with disc displacement and spondylosis in May 2017, two months before the 2017 MRI took place. (AR 103). Her diagnosis remained unchanged following the 2017 MRI. *Id.* at 35. The review committee considered Dr. Blake's physical examinations and her diagnosis. (AR 02). There is simply no evidence that Aetna either ignored or arbitrarily refused to credit the opinion of Dr. Blake or favored the opinion of Dr. Ugokwe. Rather, the review committee's final denial letter reflects consideration of both doctors' notes and reports, as required by ERISA.

Plaintiff argues that Aetna "cherry picked' evidence by emphasizing the early treatment of Plaintiff and focusing on the initial statements by Plaintiff's physicians that his 2016 disc bulges did not explain all of Plaintiff's pain. Defendants respond that while Aetna did consider

the early evaluations of Plaintiff, the review committee also considered the 2017 MRI results and the reports of Dr. Blake and Dr. Ugokwe, both of whom examined Plaintiff following the 2017 MRI. The Court agrees with Defendants.

An administrator acts arbitrarily and capriciously when it "engages in a select review of the administrative record" to justify a decision to deny benefits. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381-82 (6th Cir. 2005). For example, in *Moon,* the plan administrator ignored all of the claimant's treating physicians who agreed that she had a significant disability, arbitrarily favoring the one physician who concluded that she did not. *Id.* The record does not indicate that any such selective review occurred here. Plaintiff's disability claim was reviewed over a multi-step process that included various physicians and an appeal review committee examining Plaintiff's medical records. Although neither of Aetna's physician peer reviewers appeared to have physically examined Plaintiff, both reviewed all of the documentation submitted to date in the case, and in their opinions they list and describe the data they used to reach their conclusions. After each review step, Plaintiff had the opportunity to submit additional medical documentation to support his claim. The denial letters reflected the evidence considered by Aetna, and explained Aetna's rationale for its decisions. There is no evidence that Aetna "cherry-picked" the earliest reviews of Plaintiff's file in reaching its decision.[1]

---

[1] The Court notes that Plaintiff's argument that Defendants "cherry-picked" the earliest reviews of Plaintiff's file is entirely inconsistent with Plaintiff's argument that Defendants relied too heavily upon Dr. Ugokwe's report. Only Dr. Blake and Dr. Ugokwe examined Plaintiff after the 2017 MRI. In order to conduct a comprehensive review of the Plaintiff's claim, Defendants properly considered the analyses of both physicians in reaching its conclusion.

### B. Conflict of Interest

The Sixth Circuit has held that an inherent conflict of interest exists when a plan administrator both pays benefits and is vested with discretion to determine eligibility for benefits. *DeLisle,* 558 F.3d at 445. Here, this inherent conflict of interest does not exist, because the Plan is self-funded by Fed Ex, and the benefits determinations were made by Aetna. (AR 515). There is no evidence that Fed Ex was involved in Plaintiff's benefit determination or appeal process, and Plaintiff does not raise this issue.

### C. Social Security Determination

There is no evidence in the record of any disability finding by the Social Security Administration.

### D. File Review

The Sixth Circuit has consistently held that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 296 (6th Cir. 2005). Still, "an administrator's decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan." *Judge v. Metro. Life Ins. Co.,* 710 F.3d 651, 663 (6th Cir. 2013). In evaluating the propriety of an administrator's reliance on a file review, a court should consider whether the file review takes into account the employee's entire file, provides reasons for rejecting the opinions of treating physicians, and makes credibility determinations. *Id.*; *Calvert,* 409 F.3d at 296-97.

Here, the Plan does reserve the right to conduct a physical examination, but the file review conducted by the peer-review physicians met the standards set forth by the Sixth Circuit

in *Judge.* Like in *Judge,* the physicians here reviewed all of the evidence in the file, made no credibility determinations about Plaintiff, and made note of where Plaintiff's file lacked objective medical evidence. *See Judge,* 710 F.3d at 663. As set forth above, the conclusions by Dr. Ugokwe and Dr. Trombly were also supported by the record. Plaintiff also raises no argument that Aetna's analysis was inadequate due to its failure to conduct a physical examination. Thus, the Court finds that it was not arbitrary and capricious for Aetna to rely on the file review in making its determination that Plaintiff was not entitled to short term disability benefits.

For the foregoing reasons, the Court concludes that Defendants' decision to deny Plaintiff disability benefits was not arbitrary and capricious because it was supported by a deliberate, principled reasoning process and substantial evidence.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 12) is GRANTED, and Plaintiff's Motion for Administrative Remand (Doc. 13) is DENIED.

IT IS SO ORDERED.

     /s/ Patricia A. Gaughan
    PATRICIA A. GAUGHAN
    United States District Court
    Chief Judge

Dated: 2/21/19